☑ Original ❒ Duplicate

CLERK'S OFFICE
A TRUE COPY
Sep 09, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Target Phone, which is securely stored at the Racine County Sheriff's Office property room, item number 25-001862, located at 717 Wisconsin Avenue, Racine, Wisconsin

Case No. 25 MJ 144

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 09/23/2025 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable William E. Duffin.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 09/09/2025 at 9:32 a.m.

William E. Duffin
*Judge's signature*

City and state: Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A

Property to be Searched

The below-described **Target Phone**, which is securely stored at the Racine County Sheriff's Office property room, item number 25-001862, located at 717 Wisconsin Avenue, Racine, Wisconsin:

- A blue iPhone 13, back of phone cracked, in a clear case

# <u>ATTACHMENT B</u>

Particular Things to be Seized

All records on the electronics described in Attachment A that relate to violations of Title 18, United States Code, Section 1591(a) (sex trafficking by force, fraud, or coercion) involving Duarte, **from January 1, 2025 through the present**, including:

a. All stored electronic communications, including email, instant messaging, text messaging, multimedia messaging, and communications in third party apps;

b. All contact lists and records of communications with those contacts, including call logs and written messages of any kind;

c. All images, videos, travel records, information related to the identity of victims, and any other content or records on the phone.

d. All photographs or videos;

e. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, and Internet Protocol addresses;

f. All web browsing history;

g. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, and saved usernames and passwords.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical

experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

CLERK'S OFFICE
A TRUE COPY
Sep 09, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Target Phone, which is securely stored at the Racine County Sheriff's Office property room, item number 25-001862, located at 717 Wisconsin Avenue, Racine, Wisconsin.

Case No. 25 MJ 144

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the ______ District of ______, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1591 | human trafficking by force, fraud, or coercion |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Kathrine L. Sadler
*Applicant's signature*

Kathrine L. Sadler, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 09/09/2025

William E. Duffin
*Judge's signature*

City and state: Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Kathrine L. Sadler, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since May of 2019. I have been assigned to the FBI Milwaukee Child Exploitation and Human Trafficking Task Force since July 2022. My duties include investigating violations of federal law, including but not limited to offences involving coercion, enticement, and sexual exploitation of minors, forced labor, and sex trafficking. Prior to being employed as a Special Agent with the FBI, I was employed as a Staff Operations Specialist for the FBI since 2010.

3. I have received training related to the investigation and enforcement of federal human trafficking laws. As a result of this training and my experience, I am familiar with the ways traffickers use to recruit, communicate with, control, and exploit their victims. These include posting online advertisement for commercial sex dates, communicating electronically with prospective commercial sex buyers, distributing sexually explicit images and videos of trafficking victims, and transporting victims to commercial sex dates. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and processing and identification of electronic evidence.

4. The facts of this affidavit come from my personal observations, my training and experience, information obtained from citizen witnesses, and information reported to me by other

law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, "case agents," "officers," "detectives," or "investigators" refers to the federal, state, and local law enforcement officer who have participated directly in this investigation, and with whom I have acquired information from and/or had contact regarding this investigation.

5. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

6. I make this affidavit in support of an application for the issuance of a warrant to search blue iPhone 13, back of phone cracked, in a clear case, property item 25-001862, (hereinafter "**Target Phone**"). The **Target Phone** is presently stored in the custody of the Racine County Sheriff's Office property room located at 717 Wisconsin Avenue, Racine, Wisconsin.

7. There is probable cause to believe that the **Target Phone** listed above has been used as instrumentalities of, and contain evidence of, violations of Title 18, United States Code, Sections 1591(a)(1), (b)(1) (sex trafficking by force, fraud, or coercion).

THE RELEVANT FACTS

8. The United States is investigating Hector Duarte for violations of Title 18, United States Code § 1591 (human trafficking by force, fraud, or coercion).

9. On June 25, 2025, at approximately 02:15 PM, Cudahy Police Department (PD) officers were dispatched to 6275 S. Packard Avenue, Cudahy Wisconsin regarding a check welfare call for service. Officers made contact with Charlotte Japhet (Japhet) (DOB: XX/XX/2005) and her child, C.J.M. (DOB: XX/XX/2024). Japhet was transported to Cudahy PD where she disclosed to officers that she was kidnapped in Rockford, Illinois approximately three weeks ago by a male

who she only knows as "Roberto," later identified by Japhet via photo as Hector Duarte (DOB: 03/21/1990), hereinafter referred to as Duarte.

10. Law enforcement was able to identify "Roberto" as Duarte by conducting open-source research and locating a TikTok video posted on 06/22/2025 from TikTok account "charlottejap24" which showed Japhet in a vehicle with a Hispanic male. Law Enforcement tools were used which identified the Hispanic male to potentially be Duarte with high probability.

11. Investigators interviewed Japhet at the Cudahy PD who stated the following. She started to communicate with Duarte over Snapchat about three months prior to meeting him in person. Initially, Japhet proved her Snapchat account as "c_j20500" and recalled Duarte's Snapchat username to be "Roberto" something. Later in the evening of June 25, 2025, Japhet's aunt, Michelle C. Japhet, came to pick up Japhet and showed screenshots of conversations between her daughter and Japhet showing Japhet's Snapchat username to be "cj2005_772". During the time Japhet communicated with Duarte, she lived at her aunt's house with her son. Duarte asked her when her aunt was working and picked Japhet and her son up while her aunt was away. Japhet believed her and Duarte would be in a relationship and live together in Rockford, Illinois, however Duarte drove her and her son approximately two hours on the highway to an apartment in the Milwaukee, Wisconsin area. Duarte told Japhet they were there to smoke weed, however Japhet was forced to have sex with five or six males that were already in the apartment. In exchange, Duarte received $2,000 from the men in the apartment. Japhet stated while she was forced to have sex with the men, Duarte had her son.

12. After this incident, Duarte drove Japhet and her son to a forest reserve to sleep for the night. Japhet was unfamiliar with the area and was not able to provide a location of the forest reserve. Japhet tried to escape while Duarte was sleeping but he woke up and started to hit her,

punching her in the face. Duarte threatened to physically hurt her son and told her that it was easy to snap a baby's neck. Japhet became fearful of trying to leave Duarte after he made those statements.

13. Japhet disclosed that Duarte raped and choked her several times while she was with him. Duarte used physical violence on her if she didn't do something he told her to do. Duarte wanted Japhet to do drugs, such as crack cocaine, heroin, and ecstasy, have sex with his friends, and drink. Duarte tried to make her do drugs. If she said "no," he would beat her. Japhet disclosed she did take drugs once (crack cocaine) because she was tired of getting beat. Duarte never gave her son any drugs, but did threaten to put heroin in his bottle and make him drink it.

14. Japhet disclosed to investigators that she was forced to have sex with Duarte's friends approximately five times per day, every day of the week. She had sex with multiple men and sometimes multiple men at the same time. This took place at apartments or houses, but not in hotels or in cars. Duarte would drive her to the sex dates and would watch her. Her son would be with Duarte when she was forced to have sex. When the men were done having sex with her, they would pay Duarte in cash. Japhet did not know how Duarte found the men she was forced to have sex with. Duarte also took nude and partially nude photos of her, but she is not sure if he posted them online.

15. Japhet was unable to provide exact locations of where Duarte had her do commercial sex dates or the locations of where they would spend the night, but recalled driving over Hoan Bridge in Milwaukee, Wisconsin multiple times per day. Japhet stated at night they would sleep out of Duarte's vehicle at forest reserves, parks, and parking lots. They would get food from Walmart or fast-food places like McDonald's. Japhet was not allowed to leave Duarte's sight, and he was always by her side.

16. Japhet stated on the day she escaped Duarte, they were driving, and while stopped at the intersection of N. Chicago Avenue and E. College Avenue on the border of Cudahy and South Milwaukee, she saw two businessmen on the side of the road. Once Duarte stopped the vehicle, she got out of the car with her son and ran to the businessmen she had seen. They took her to the gas station and called the police for assistance.

17. After investigators made an identification of Duarte with high probability, an unmarked photo of Duarte was sent to Japhet's aunt and shown to Japhet. Japhet identified the unmarked photo of Duarte as the male that had taken her and her son from Rockford, Illinois to Milwaukee, Wisconsin and who had forced her to have sex in exchange for money.

18. On June 26, 2025, Case Agents obtained records from Wisconsin Department of Transportation which identified Duarte is the registered owner of a gray 2022 Chevrolet Equinox with Wisconsin plate BAC5283 and VIN: 2GNAXKEV0N6101075 as well as a 2000 Buick Sedan with Wisconsin plate ASK2507 and VIN: 2G4WS52J9Y1351444.

19. On July 3, 2025, investigators obtained surveillance video from Walmart located at 222 N. Chicago Avenue, South Milwaukee, Wisconsin, which is just south of the call for service referenced above, across College Avenue. This video showed a dark colored SUV parking near the front entrance on 06/25/2025 at approximately 02:03 PM. A male driver is seen getting out of the vehicle, which, based on a review of prior booking photos, appears to be Duarte wearing a hat, t-shirt, jeans, and black shoes. Duarte entered Walmart at approximately 02:03 PM and at approximately 02:06 PM, Japhet is seen exiting the rear passenger side door of the dark colored SUV. Japhet is seen grabbing a bag/backpack from the vehicle, walk to the driver side and gets her baby out of the SUV. Surveillance footage shows Japhet running east bound at the Walmart parking

lot approximately 02:07 PM, then north bound. For a few seconds, Japhet is seen stopping at a white van, then keep walking and goes out of frame.

20. Walmart surveillance footage shows Duarte walks to a green Eco ATM kiosk (an ATM to sell electronics such as cellphones, laptops, tablets etc.) in the front of the Walmart store at approximately 02:04 PM. Duarte is at the kiosk until approximately 02:09 PM when he leaves the kiosk, exits Walmart, and enters the SUV. At approximately 02:11 PM, Duarte exits the vehicle, looking around the lot, and walks back towards Walmart entrance and enters Walmart a second time at approximately 02:11 PM. Duarte is seen walking towards the bathrooms at approximately 02:12 PM and waits there until approximately 02:13 PM. Duarte then exits Walmart, looking around the parking lot while walking faster, and enter the SUV. At approximately 02:14 PM, the SUV reverses out of the parking spot and drives to the Wendy's parking lot located east of Walmart. Duarte gets out of the SUV at Wendy's at approximately 02:14 PM and the surveillance video cuts out.

21. Case agents obtained surveillance footage from Wendy's located at 240 N. Chicago Ave, South Milwaukee, Wisconsin, which showed Japhet coming from the Walmart parking lot at approximately 2:08 PM on June 25, 2025. Japhet appear to be holding something or someone, while wearing a backpack. Japhet then walks north bound on N. Chicago Avenue.

22. Case gents obtained surveillance footage from Taco Bell located at 112 N. Chicago Avenue, South Milwaukee, Wisconsin, which showed Japhet coming from the south at approximately 2:11 PM on June 25, 2025, running north across the Taco Bell parking lot carrying something/someone wearing a backpack.

23. Cudahy PD obtained surveillance footage from Petro Mart gas station located at 6275 S. Packard Avenue, Cudahy, Wisconsin. The camera, which faces south, showed three

individuals coming into the frame at approximately 02:13 PM. The three individuals are seen crossing College Avenue at approximately 02:14 PM, one of which is Japhet holding her child and wearing a backpack and enter the Petro Mart gas station at approximately 02:15 PM.

24. On July 22, 2025, Case Agent obtained records back from AT&T which were unable to identify any information responsive to the Legal Demand. Case Agent then discovered the VIN numbers for the two vehicles registered to DUARTE had been inadvertently switched by Case Agent when writing the warrant. The 2022 Chevrolet Equinox with Wisconsin plate BAC5283 has VIN 2GNAXKEV0N6101075, not 2G4WS52J9Y135144.

25. On July 10, 2025, case agents conducted a follow-up interview of Japhet. She stated Duarte took her to a couple of hotels to do sex dates. Japhet described one of the hotels as a larger multi-level hotel with a red sign and the hotel name starting with a "P." Japhet stated when she would do sex dates out of the hotel, Duarte would hide in the bathroom with her son. She did both in-call and out-call sex dates and had not done any commercial sex dates prior to meeting Duarte. Duarte set up the sex dates and she had to smoke, drink, and talk to customers prior to the sex act. Japhet stated she did not know what type of sex acts the customer paid for; they would tell her when they arrived. She did both oral and vaginal sex with and without condom. Customers paid more for sex without condom. Japhet explained she would also have to have sex while she was on her period and most of the time she had to have sex with multiple customers at the same time. Japhet did not want to prostitute for Duarte.

26. Japhet described she was scared while she was with Duarte. Duarte had her stay close to him at all times and she was not allowed to look up when other men were around. Japhet stated she asked to leave multiple times, but Duarte wouldn't let her. If she refused him or tried to leave, he would use physical violence. He would punch her face with a closed fist, use a razor

blade to cut her right thigh and feet, and would kick and stomp on her. This occurred multiple times. She would also get choked by Duarte to the point that she would lose consciousness, this occurred less frequent than getting beat. Customers would also choke her while having sex with her. Duarte would be there to watch, but did not say anything. Japhet explained that during the times when Duarte was physically violent with her, her son would be in a different room or in the back seat of Duarte's car. Duarte never hurt her son, but he would yell at her son.

27. Duarte would force her to have sex with him often. He would hold her down and take off her clothes while she would be kicking and screaming. There were times when Duarte's friends would be there and help hold her down and take her clothes off.

28. On August 13, 2025, case agents brought Japhet on a ride-along to areas believed she was taken by Duarte. Japhet explained that when she first met Duarte things between them were good. They hung out, smoked weed, talked, and got to know each other. Duarte told her that he worked at Amazon and that he grew up in Chicago, Illinois. After approximately two weeks, things changed. They met up with one of Duarte's friends at Bradford Beach in Milwaukee, Wisconsin, a location she identified during the ride-along. They smoked weed at the beach while her son was sleeping in Duarte's car. Duarte's friend offered Duarte money in exchange for him having sex with Japhet. Japhet did not want to have sex with Duarte's friend, but he ended up having sex with her and paid Duarte approximately $500 or $600. This incident occurred at night around 3am or 4am while on the beach. Japhet explained after that incident their relationship changed. Japhet believed it was Duarte's motive all along to have her work as a prostitute for him.

29. During the ride-along, Japhet identified the Potawatomi Casino & Hotel as one of the hotels Duarte had taken her. Japhet believed she stayed there one or two times and explained Duarte had a friend that worked at the hotel that gave Duarte a hotel room for free on one of the

top floors. Japhet did sex dates out of the hotel room. She saw “Welcome Michael” on the TV screens in the hotel room and believed that was the name of the person who got Duarte the hotel room.

30. On August 21, 2025, pursuant to a Grand Jury subpoena request for records, Potawatomi Casino & Hotel provided records showing Duarte was listed as an accompany guest for a Michael Catt (DOB: XX/XX/1975). The records showed Catt obtained a hotel room on June 18, 2025, to June 19, 2025, with Duarte listed as his guest. This stay occurred during the time period Japhet was with Duarte.

31. On August 27, 2025, Deputy Doran Turchin of the Racine County Sheriff’s Office was notified by a citizen that two people were arguing behind Coal Miners Bar located at 1024 Main Street, Union Grove, Wisconsin. The citizen described the two individuals as a heavy-set male and a female wearing a tie dye shirt. The female was identified as HC. Deputy Turchin responded to the area and observed the white heavier set male near the driver side of a vehicle and a female in a tie dye shirt exit the vehicle and was holding what appeared to be two shooters of alcohol in her hand. Deputy Turchin asked the female what was going on and she stated she was trying to get “Hector” out of her car. Deputy asked who “Hector” was to the female to which she stated he was a friend.

32. Deputy Turchin made contact with “Hector” who was identified via his Wisconsin driver’s license as Duarte. Duarte was asked about the incident with the female and also how much he had to drink. Duarte stated he had a couple of drinks. Deputy Turchin observed Duarte swaying and smelled like the odor of intoxications. Deputy Turchin asked Duarte if he was supposed to be drinking and if he had any open cases. Duarte stated “yeah” to both questions. Duarte was asked what his case was for, and he stated “domestic.”

33. Deputy Turchin conducted a CCAP search of Duarte which indicated he had an open court case. In reviewing the court case, part of Duarte's bond conditions were the following "Charges per attached criminal complaint. Conditions: Make all court appearances on time. Failure to appear will result in the issuance of a warrant for your arrest, possible bail jumping charges and forfeiture of any bond on deposit. No contact with the victim HC (person, property, residence or family). It is a condition of this bond that the defendant NOT consume or possess any alcohol. This is to be monitored through random drug screens and/or breathalyzers by the Racine County Alternatives Program."

34. Duarte was placed under arrest, placed in handcuffs, checked for proper fit, double locked and searched. Duarte was then transported to Racine County Jail located at 717 Wisconsin Avenue, Racine, Wisconsin. Duarte was turned over to jail staff without incident. Duarte's property, which included **Target Phone**, was placed in property bag #324. Duarte was charged with one count of felony bail jumping due to the fact, he had alcohol in his possession and smelled liked intoxicants in violation of his bail conditions, and a second count of felony bail jumping for having contact with HC in violation of bail conditions.

35. On September 4, 2025, case agent was notified that Duarte was in custody at the Racine County Jail. Case Agents contacted Racine County Sheriff's Office Detective Luke Johnson who confirmed Duarte was in custody and had one phone, **Target Phone**, in his property.

36. Corrections Officer Carson Swaney pulled the **Target Phone** from property, per Detective Johnson request, who then transported the **Target Phone** from the Racine County Jail property room to the Racine County Sheriff's Office property room for storage under property item number 25-001862.

37. On September 5, 2025, Detective Johnson reviewed body worn camera from the arrest and booking of Duarte. Duarte provided his phone passcode as "four zeros" to unlock the **Target Phone**.

38. Based on the foregoing, there is probable cause to believe that Duarte engaged in sex trafficking by force, fraud, and coercion. I know from my training and experience that when an individual uses or is instructed to use an electronic device to further a sex trafficking operation, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime, including data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

39. Many traffickers and pimps post advertisements or communicate with known and potential victims or clients through the use of digital devices, computers and the Internet. These ads and communications, along with the related accounts used, may contain evidence, including of victims' names, location information, or descriptions of criminal acts. Traffickers and pimps commonly take photographs for prostitution advertisements on cameras, cellular telephones, and other electronic devices. These photographs can then be uploaded directly to the Internet or transferred to another electronic medium. Traffickers and pimps frequently retain photographs of current and former persons they are sexually exploiting or have sexually exploited, on electronic devices. Traffickers and pimps also utilize cellular telephones to direct victims in the commercial sex trade, through direct conversation and text messaging. These instructions commonly include such things as when and where to work, and how much to charge for particular services. Trafficker

also commonly transport their victims to prostitution tracks or outcall prostitution dates, and they often use digital devices to navigate to those locations. There is evidence, based on the interviews described above, that most—if not all—of these generalities are true in this case.

40. The **Target Phone** is currently stored at the Racine County Sheriffs Property room. In my training and experience, I know that the **Target Phone** has been stored in a manner in which the content, to the extent material to this investigation, in substantially the same state as it was when the **Target Phone** first came into the possession of the Racine County Sheriff's Office on August 27, 2025.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41. Based on my training, experience, and research, I know that the **Target Phone** have capabilities that allow it to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs, among others. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

42. Based on my knowledge, training, and experience, I know that electronic devices like the **Target Phone** can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

43. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Phone was used, the purpose of the usage, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Phone** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

44. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

45. *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

46. *Delayed notice*. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize delayed notice until 180 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to Duarte would seriously jeopardize the ongoing investigation, as such a disclosure would give him an opportunity to destroy evidence, change patterns of behavior, notify confederates, or otherwise attempt to thwart the prosecution. See 18 U.S.C. § 3103a(b)(1).

## CONCLUSION

47. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Phone described in **Attachment A** to seek the items described in **Attachment B**.

# ATTACHMENT A

Property to be Searched

The below-described **Target Phone**, which is securely stored at the Racine County Sheriff's Office property room, item number 25-001862, located at 717 Wisconsin Avenue, Racine, Wisconsin:

- A blue iPhone 13, back of phone cracked, in a clear case

## ATTACHMENT B

Particular Things to be Seized

All records on the electronics described in Attachment A that relate to violations of Title 18, United States Code, Section 1591(a) (sex trafficking by force, fraud, or coercion) involving Duarte, **from January 1, 2025 through the present**, including:

a. All stored electronic communications, including email, instant messaging, text messaging, multimedia messaging, and communications in third party apps;

b. All contact lists and records of communications with those contacts, including call logs and written messages of any kind;

c. All images, videos, travel records, information related to the identity of victims, and any other content or records on the phone.

d. All photographs or videos;

e. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, and Internet Protocol addresses;

f. All web browsing history;

g. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, and saved usernames and passwords.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical

experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.